**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:23-cr-00067-IM |
| v. | **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT WILLIAMS'S MOTION TO SUPPRESS** |
| **ERIC KARNEZIS, FREDRICO WILLIAMS, LYNISHA WELLS**, and **NIKKIA BENNETT**, | |
| Defendants. | |

Meredith D.M. Bateman, Christopher L. Cardani, William M. Narus, James A. Killcup, Nicholas D. Meyers & Suzanne A. Miles, Assistant United States Attorneys, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Attorneys for the United States of America.

Ernest Warren, Jr., Warren & Sugarman, 838 SW 1st Ave, Suite 200, Portland, OR 97204. Attorney for Defendant Fredrico Williams.

**IMMERGUT, District Judge.**

A grand jury indicted Defendants Eric Karnezis, Fredrico Williams, Lynisha Wells, and Nikkia Bennett on charges of wire fraud, 18 U.S.C. § 1343, conspiracy to commit wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h), for their involvement in the submission of fraudulent loan applications through the Paycheck Protection Program ("PPP"). Redacted Superseding Indictment ("Superseding Indictment"), ECF 31 ¶¶ 1–2,

PAGE 1 – OPINION AND ORDER

47–227.  Williams now moves to suppress statements that he made to law enforcement agents during a post-indictment custodial interrogation. Motion to Suppress ("Motion"), ECF 153.

Although Williams raises "five independent constitutional and statutory grounds" to suppress these statements, *id.* at 5, the crux of his motion is that the government violated his constitutional right to counsel by continuing to question him after he invoked his right to counsel. Williams argues that during his custodial interrogation, he "attempted to invoke his right to counsel no fewer than twelve separate times." *Id.* The government counters that Williams "overstates what the transcript shows." Response to Motion to Suppress ("Response"), ECF 162, at 5. This Court agrees with the government that several of Williams's asserted invocations of his right to counsel were either "equivocal" requests that did not require questioning to end, or were not invocations at all. *Michaels v. Davis*, 51 F.4th 904, 922 (9th Cir. 2022); Response, ECF 162, at 5 (describing statements as not "unequivocal").

However, certain invocations of his right to counsel during the interrogation were "clear and unambiguous." *Sessoms v. Grounds*, 776 F.3d 615, 624 (9th Cir. 2015). Some of these invocations were "selective invocations of *Miranda*," which require suppression only "with respect to the subject matter . . . as to which the suspect invoked the right." *Michaels*, 51 F.4th at 921–22. But Williams eventually invoked his right to counsel without limitation when he asked, "Can I call my attorney?" Williams Interview Transcript ("Williams Tr.") 168:25, ECF 162-1 at 168. At this point, "questioning should have stopped until an attorney was present." *Smith v. Endell*, 860 F.2d 1528, 1532 (9th Cir. 1988).

Because federal agents continued to question Williams after this point, any statements that Williams made during the remainder of the interrogation must be suppressed. In addition, any statements that Williams made concerning subjects for which he selectively invoked his

PAGE 2 – OPINION AND ORDER

*Miranda* rights must also be suppressed. But as to the remainder of statements that Williams made during the interrogation, the government did not obtain them in violation of *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Williams's remaining arguments for the suppression of his statements and any "derivative evidence," Motion, ECF 153 at 5, lack merit. Williams also requests an evidentiary hearing on various alleged factual disputes, *id.* at 6, but Williams fails to demonstrate that an evidentiary hearing is warranted to resolve any factual issues.

On July 15, 2026, this Court held a combined hearing on Williams's Motion to Suppress, ECF 153, and Motion to Compel, ECF 152, and took the motions under advisement. ECF 191. After reviewing the pleadings and considering the arguments of counsel at the hearing, this Court GRANTS IN PART and DENIES IN PART Williams's Motion to Suppress, ECF 153. Williams's Motion to Compel is addressed in a separate opinion. ECF 192.

## BACKGROUND

### A. Defendant's Arrest and Interview

On March 7, 2023, a grand jury charged Fredrico Williams with one count of conspiracy to commit wire fraud, 18 U.S.C. § 1349, and two counts of wire fraud, 18 U.S.C. § 1343. Redacted Indictment, ECF 1 ¶¶ 11–53. On March 21, 2023, at around 9:30 a.m., six federal agents arrested Williams in San Diego County, California. Motion, ECF 153 at 6. The agents transported Williams to the IRS facility in the Federal Building, Pasquale Declaration, ECF 190-1 ¶ 6, and according to Williams, the agents told him during the car ride: "They don't want you—they want Karnezis."[1] Motion to Compel, ECF 152 at 4.

---

[1] The government states it "has no discovery related to the transfer of [Williams] from his arrest location to his interview location." Amended Response to Motion to Compel, ECF 166 at 21.

At the IRS facility, the same six federal agents conducted a recorded interview of Williams, which took place between 10:46 AM and 2:03 PM. Motion, ECF 153 at 7. At the outset of the interview, Special Agent Andrew Hamilton Smith administered *Miranda* warnings to Williams. Williams Tr. 3:15–4:1, ECF 162-1 at 3–4. After these warnings were given, the following exchange occurred::

> **SMITH**: [Y]ou may waive your right to advice of counsel and your right to remain silent, and you may answer questions to make a statement without consulting a lawyer if you so desire. So you don't have any issue with talking to us; right?

> **WILLIAMS**: No, I don't have an issue, but I would like to --

> **SPECIAL AGENT KRISTOPHER PASQUALE**: At the end of the day, like, what we were trying to talk about in the car and help you understand is that there are many layers above you and this is that opportunity that we have. We won't have a future opportunity, most likely, to be able to discuss with you those most important things.

*Id.* 4:2–14.

Agent Pasquale proceeded to explain the value of cooperation, and at the end of the explanation, Williams responded, "Yeah. That's fine." *Id.* 4:15–5:11. Agent Smith soon after explained to Williams, "And if there's any questions you don't want to answer, you can just say, 'I don't want to answer that.' Does that make sense?" *Id.* 5:16–18. Williams responded, "Yeah." *Id.* 5:19. At that point, the agents provided Williams with a written *Miranda* waiver form, which Williams signed. Signed *Miranda* Waiver ("Waiver"), Ex. 3, ECF 162-2; *see* Williams Interview Video ("Williams Video") 3:48–4:06, Ex. 2, ECF 163; Williams Tr. 6:13–14, ECF 162-1 at 6.

Federal agents commenced the interrogation by asking Williams about businesses that he owned. Williams admitted that he submitted PPP loan applications for two of his businesses and these loans were approved for around $145,000 and $147,000. Williams Tr. 12:25–14:11, ECF 162-1 at 12–14; *id.* 18:7–14. Williams confirmed that he did not pay payroll taxes or file documentation with the IRS for these two businesses. *Id.* 14:25–15:3. Williams explained how

PAGE 4 – OPINION AND ORDER

he had to pay "a third" of his PPP loan proceeds to either codefendant Karnezis or alleged coconspirator Bayless Cobb. *Id.* 20:22–21:16. Williams also admitted that in his two applications for COVID-19 Economic Injury Disaster Loans ("EIDL"), he overstated each business's revenue. *Id.* 26:11–30:11; 36:21–37:13. Both applications were approved, and Wiliams received two EIDLs of around $150,000 and $30,000. *Id.* 31:23–32:3; 35:13–19. With the money that he received from PPP loans and EIDLs, Williams purchased cars for himself, his son, and his daughter. *Id.* 33:5–34:20. Williams insisted that these cars were purchased for business purposes to list on Turo, the "Airbnb for cars." *Id.* 33:5–34:20.

The interrogation proceeded to delve into Williams's businesses in greater detail. At the end of this discussion, Williams made the following confessions regarding his loan applications:

> **PASQUALE**: And you know that what was being applied for wasn't going to be accurate because your business didn't have these revenues. They didn't have any cost. It didn't have employees. They weren't reporting any payroll. They weren't paying taxes. You knew none of this was going to be accurate; correct?
>
> **WILLIAMS**: Yeah. I didn't even think about any of that because --
>
> **PASQUALE**: You saw, "Hey, this is free money, and it will be forgiven. We will be good"?
>
> **WILLIAMS**: Yeah.
>
> **PASQUALE**: "And because I'm giving them this third of it, they're going to make sure it's taken care of"?
>
> **WILLIAMS**: Yeah.
>
> **PASQUALE**: Is that accurate? I want you to be able to describe it, right, in your own words?
>
> **WILLIAMS**: Yeah. That's dead-on.

*Id.* 69:23–70:17. Soon after these confessions, the agents stopped to take a break. *Id.* 75:23–76:3. During the break, Williams said, "But so I do not -- because I forget who it was earlier, but I was asking, when do I get to -- I have no problem with talking to you about any of this." *Id.* 76:4–6.

When the questioning resumed, federal agents and Williams had the following exchange:

PAGE 5 – OPINION AND ORDER

**SPECIAL AGENT BRIAN BERTNIK**: All I want to do is go through and talk about your EIDLs and say, "Hey, did this one go into this account?" Boom. "Did this one go into this account?" We kind of already talked about it, but I'm just looking at the actual --

**PASQUALE**: And if you don't want to go into the bank accounts, you're, like "I don't want to answer those questions," then you don't have to answer the questions.

**BERTNIK**: Yeah. We can move on.

**PASQUALE**: You're perfectly in your right to say that.

**WILLIAMS**: I would prefer to do that with my attorney.

*Id.* 77:9–23. Despite this request, federal agents later questioned Williams about information relating to his bank accounts. For example, Agent Pasquale asked, "So in the accounts, there's a bunch of money coming from other people to you. Are those people who received PPP loans?" 83:12–15. Agent Pasquale also asked, "They would pay you directly, all that money would come into your account, and then you would consolidate it and send it where?" *Id.* 85:10–13. When Agent Pasquale later inquired about Williams's purchase of a business, Pasquale asked, "What bank account did you pay it from?" *Id.* 138:17–18.

However, immediately after Williams requested counsel with respect to his bank accounts, agents shifted their focus onto Eric Karnezis and Bayless Cobb. *Id.* 77:24–79:9. Williams explained how individuals requested PPP loans through Karnezis and Cobb. Individuals would fill out a spreadsheet with personal information, including their first name, last name, social security number, date of birth, and bank account information, and then they would send the spreadsheets to an email address associated with Bayless Cobb, who would in turn send that information to Eric Karnezis. *Id.* 78:14–79:9; 94:20–95:10; 98:3–19. Williams estimated that "[i]n the sphere of people" that he knew, about 30 or more individuals requested PPP loans from Bayless Cobb. *Id.* 80:6–81:12. Williams also admitted that he helped facilitate the movement of money for about 15 of these individuals and that Karnezis and Cobb paid him a flat "finder's fee" of $5,000 per person. *Id.* 84:25–87:1. Williams explained how the scheme operated in

PAGE 6 – OPINION AND ORDER

detail, including codefendant Nikkia Bennett's role in completing and sending spreadsheets. *Id.* 87:2–100:10.

After questioning Williams about his communications with Karnezis and Cobb, the federal agents asked to make a "digital copy" of Williams's phone. *Id.* 122:13–123:11. Williams replied, "I think for that one, I would want to ask my attorney, if that's okay. But as far as the messages from Eric and Bayless, I can show you that." *Id.* 123:12–15. But before Williams showed any messages, the agents took a break, and Williams asked, "Do you know if at some point I get to call my attorney, or is that something later?" *Id.* 130:10–11. An agent responded:

> **SPECIAL AGENT JOHN PELLEY**: I mean, that's, again, totally up to you. It's obviously your right as a, you know, American citizen. It's your right to an attorney at any point. So I think the thing is, we just kind of want to get through this high-level stuff. But obviously, again, if at any point you want to call anyone or your attorney, whenever.

*Id.* 130:12–18. In response, Williams did not make any request for an attorney. *Id.* 130:19–21.

After the break, federal agents again asked to copy the contents of Williams's phone, but Williams reiterated, "I just need to make sure that, you know, if my attorney was to say, 'You can give him this,' I would feel more comfortable[.]" *Id.* 132:9–18. The agents then asked Williams to pull up various text messages on his phone so the agents could photograph them. *Id.* 132:19–133:2. But first, the agents continued questioning Williams about the flow of money in the scheme, and at one point, Agent Pasquale asked Williams, "Well, did you use the PPP money specifically to buy those three cars? Are you sure of that?" *Id.* 148:17–19. Williams responded, "No. That I will leave for when the attorney comes in." *Id.* 148:20–21. The agents also asked Williams about his familiarity with several individuals who sent him money or to whom he sent money, including codefendant Lynisha Wells, who submitted her application through Bennett. *Id.* 152:6–168:6.

Following this discussion, Williams asked, "Can I call my attorney?" *Id.* 168:25. Agent Pasquale explained the booking process to Williams, after which agents asked Williams to sign a waiver to allow them to search his phone. *Id.* 169:1–174:15. Before signing the waiver, Williams appeared to question the scope of the waiver and asked, "Do you mind if I call the attorney real quick?" *Id.* 174:16–17. After a brief discussion regarding the waiver, the agents allowed Williams to add additional language to the waiver so that he would agree to sign it, and then the agents took photos of messages on Williams's phone. *Id.* 175:1–177:18. After Agent Smith asked Williams to "[p]ull up Bayless' contact," Williams again said, "Can I call my attorney from --". *Id.* 177:17–21. Agent Pasquale interrupted, "You absolutely can." *Id.* 177:22.

But agents continued to take photos of messages and spreadsheets on Williams's phone and asked him related questions. *Id.* 177:3–184:10. When agents asked Williams to send them a spreadsheet over email, Williams again asked, "[C]an I call my attorney?" *Id.* 184:25–185:1. Agents told him, "You can call your attorney," but they asked him to first send the spreadsheet. *Id.* 185:2–6. Due to technical difficulties, Williams was unable to send the spreadsheet, and once again asked, "Can I just call my attorney real quick?" *Id.* 185:7–186:16. After this fifth request, agents ended the interrogation and allowed Williams to call his attorney. *Id.* 186:17–187:12.

After the interview, Williams was transported to San Diego County jail, where he was held overnight. Motion, ECF 153 at 12. The next morning on March 22, 2023, Williams was booked into jail, and the next day, he was presented to a magistrate judge. *Id.* According to the government, "[t]his delay was not caused by a desire to interrogate defendant [Williams] but rather jail and district-required protocol for processing and booking." Response, ECF 162 at 20 n.4.

PAGE 8 – OPINION AND ORDER

## B. Superseding Indictment

On August 21, 2024, a grand jury returned a superseding indictment, charging Eric Karnezis, Fredrico Williams, Lynisha Wells, and Nikkia Bennett with one count of conspiracy to commit wire fraud, 18 U.S.C. § 1349, twenty-one counts of wire fraud, 18 U.S. § 1343, and one count of conspiracy to commit money laundering, 18 U.S.C. § 1956(h). Superseding Indictment, ECF 31 ¶¶ 47–227. The grand jury found probable cause that between January 2021 and March 2022, Defendants defrauded the Small Business Administration out of millions of dollars by submitting fraudulent PPP loan applications. *Id.* ¶ 1. Karnezis conspired with "recruiters," including Williams, to gather false business information from "customers," such as Wells, and to submit PPP applications using fabricated documents on behalf of the customers. *Id.* ¶¶ 2, 4.

On March 20, 2025, Karnezis pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Plea Petition and Order Entering Plea as to Defendant Eric Karnezis, ECF 86. The remaining three defendants filed motions to sever their joint trial. Williams Motion to Sever, ECF 110; Bennett Corrected Motion to Sever, ECF 115; Wells Motion to Sever, ECF 119. On January 9, 2026, this Court denied the motions, ECF 146.

## C. Motion to Suppress

On March 16, 2026, Defendant Williams filed a Motion to Suppress, ECF 153.[2] In his Motion, Williams asserts that during the car ride between his arrest and his recorded interrogation, "before any Miranda warnings were administered, agents engaged Mr. Williams in substantive conversation about the investigation." Motion, ECF 153 at 7. Based on this assertion, this Court ordered the government to be prepared at the scheduled July 15, 2026 hearing "to call

---

[2] On June 19, 2026, Williams filed a sur-reply in support of his Motion to Suppress. ECF 184. Although Williams did not seek leave of court before filing a sur-reply, this Court takes notice of it because it does not alter this Court's analysis and therefore does not prejudice the government.

a witness with knowledge of any discussion that occurred during the car ride following Williams's arrest and prior to his interrogation." ECF 187. However, this Court "reserve[d] ruling on Williams's request for an evidentiary hearing." *Id.*

Prior to the July 15, 2026 hearing, the government filed a Notice Regarding Witness Availability ("Notice"), ECF 190, and attached a declaration of Agent Pasquale, ECF 190-1. In the declaration, Agent Pasquale states that while present in the car during Williams's transport, neither he nor any other federal officer "ask[ed] [Williams] substantive investigative questions about the charged conduct, including questions about PPP applications, EIDL applications, PPP forgiveness applications, loan proceeds, supporting documents, employee accounts, payroll, gross revenues, cost of goods sold, bank accounts, any co-conspirator, or defendant's involvement in the alleged offense conduct." Pasquale Declaration, ECF 190-1 ¶¶ 10–11. Moreover, Pasquale states that during the transport, Williams "did not confess to the charged conduct," "did not admit involvement in the charged conduct," and "did not make any spontaneous incriminating admissions regarding the charged conduct." *Id.* ¶¶ 12–14.

## DISCUSSION

Williams raises five arguments for the suppression of the March 21, 2023 interrogation: (1) "the entire interview must be suppressed under the Sixth Amendment," (2) "all statements after the first invocation must be suppressed under *Edwards v. Arizona*," (3) "pre-Miranda statements must be suppressed under *Missouri v. Seibert*," (4) "statements obtained during unreasonable delay must be suppressed under [Federal Rule of Criminal Procedure] 5 and *Corley v. United States*," and (5) "the AUSA's secret presence constitutes prosecutorial participation in constitutional violations." Motion, ECF 153 at 13, 15, 18, 20, 22 (citation modified).

With respect to (1), Williams's argument that the government violated his Sixth Amendment right to counsel is coextensive to his argument in (2) that the government violated

PAGE 10 – OPINION AND ORDER

his Fifth Amendment right to counsel. With respect to (2), this Court finds that although Williams did not invoke his right to counsel at the outset of the interrogation, Williams did make a selective invocation of his right to counsel on page 77 of the interview transcript, pertaining to discussion of his bank accounts. Therefore, any statements that Williams subsequently made in response to questions concerning his bank accounts must be suppressed. Moreover, Williams invoked his right to counsel without subject-matter limitation on page 168, and thus any statements that Williams made after this point must be suppressed in their entirety.

With respect to Williams's three remaining arguments for suppression, all three are unavailing. First, there is no indication that a prior interrogation occurred during Williams's car ride that would require the suppression of the recorded interrogation under *Missouri v. Seibert*, 542 U.S. 600 (2004). Second, because the recorded interrogation took place within six hours of Williams's arrest, any voluntary statements that Williams made fall under the safe harbor established in 18 U.S.C. § 3501(c) and should not be suppressed under *Corley v. United States*, 556 U.S. 303 (2009). Third, Williams points to no legal authority to support his request for suppression based on a federal prosecutor's unannounced presence during an interrogation.

Finally, Williams requests an evidentiary hearing to address various alleged factual disputes. As to some of these disputes, they are not material to the suppression of his statements, and thus, an evidentiary hearing is unwarranted. As to other disputes, Williams has not "allege[d] facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

## A.  Sixth Amendment Claim

The Sixth Amendment guarantees a criminal defendant "the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (quoting *United States v. Wade*, 388 U.S. 218, 227–228 (1967)). "Interrogation by the

PAGE 11 – OPINION AND ORDER

[government] is such a stage." *Id.* Therefore, a defendant has the "right to have the assistance of counsel at his postindictment interviews with law enforcement authorities." *Patterson v. Illinois*, 487 U.S. 285, 290 (1988). Under *Massiah v. United States*, 377 U.S. 201 (1964), the government may not use at trial a defendant's self-incriminating statements that "federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Fellers v. United States*, 540 U.S. 519, 523 (2004) (citation modified) (quoting *Massiah*, 377 U.S. at 206).

However, "the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo*, 556 U.S. at 786. "As a general matter," a defendant "who is admonished with [*Miranda*] warnings . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, 487 U.S. at 296. As the Supreme Court explained in *Montejo*, "the right to have counsel during custodial interrogation" is "guaranteed (once the adversary judicial process has begun) by two sources of law," the Fifth Amendment and the Sixth Amendment. *Montejo*, 556 U.S. at 795. Consequently, the right to counsel "under both sources is waived using the same procedure," and "doctrines ensuring voluntariness of the Fifth Amendment waiver *simultaneously ensure* the voluntariness of the Sixth Amendment waiver." *Id.* (emphasis added).

Williams overlooks these governing legal principles pertaining to waiver of his Sixth Amendment rights when he argues that because he "was already indicted when the interview began, the entire interview — from the first word to the last — was obtained in violation of the Sixth Amendment." Motion, ECF 153 at 15. Of course, Williams is correct that during his interrogation, "the government 'deliberately elicited' incriminating statements from [him] after

PAGE 12 – OPINION AND ORDER

the right to counsel attached." *Id.* at 14 (quoting *Massiah*, 377 U.S. at 206). But as noted above, a defendant who waives his Fifth Amendment right to counsel under *Miranda* likewise waives his Sixth Amendment right to counsel.[3] *Patterson*, 487 U.S. at 296; *Montejo*, 556 U.S. at 795. Therefore, Williams's Sixth Amendment claim rises and falls with his Fifth Amendment claim that the government violated his *Miranda* rights by continuing to question him after he invoked his right to counsel multiple times. *See Patterson*, 487 U.S. at 298 ("[W]hatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning.").

Williams resists this conclusion by citing *Fellers v. United States*, 540 U.S. 519 (2004), Williams Reply in Support of Motion to Suppress ("Reply"), ECF 172 at 7–8, but *Fellers* concerned self-incriminating statements made *before* a defendant received *Miranda* warnings. *Fellers*, 540 U.S. at 521. In *Fellers*, the defendant spoke with law enforcement officers at his home without receiving *Miranda* warnings. *Id*. Law enforcement officers did not Mirandize the defendant until they transported him to the county jail, at which point the defendant "signed a *Miranda* waiver form." *Id.* at 521–22. Since the discussion that occurred at the defendant's home occurred after he "had been indicted, outside the presence of counsel, *and in the absence of any waiver* of [his] Sixth Amendment rights," the Supreme Court concluded that the officers "violate[d] the Sixth Amendment standards established in *Massiah*[.]" *Id.* at 524–25 (emphasis

---

[3] The Supreme Court has qualified this general rule and recognized that not "all Sixth Amendment challenges to the conduct of postindictment questioning will fail whenever the challenged practice would pass constitutional muster under *Miranda*." *Patterson*, 487 U.S. 285 at 296 n.9. For example, "where a suspect was not told that his lawyer was trying to reach him during questioning," the Supreme Court found that the *Miranda* waiver would be valid under the Fifth Amendment, but not under the Sixth Amendment. *Id.* "Likewise a surreptitious conversation between an undercover police officer and an unindicted suspect would not give rise to any *Miranda* violation as long as the 'interrogation' was not in a custodial setting; however, once the accused is indicted, such questioning would be prohibited." *Id.* Neither situation is present here.

added). Unlike in *Fellers*, here Williams does not seek to suppress statements that he made in the absence of a *Miranda* waiver. Federal agents Mirandized him at the outset of the custodial interrogation, and he waived his *Miranda* rights, as discussed below. Williams Tr. 3:15–5:11, ECF 162-1 at 3–4. In short, *Fellers* does not relieve Williams from the general rule that a valid *Miranda* waiver is a valid Sixth Amendment waiver.

## B.  *Miranda* Violations

In *Miranda*, the Supreme Court held that a "suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457 (1994). In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court further held that the *Miranda* right to counsel "requires the special protection of the knowing and intelligent waiver standard." *Davis*, 512 U.S. at 458 (citation modified) (quoting *Edwards*, 451 U.S. at 483). However, "an express verbal or written waiver is not required." *Burney v. Broomfield*, 175 F.4th 1089, 1114 (9th Cir. 2026); *see also Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("The prosecution . . . does not need to show that a waiver of *Miranda* rights was express."). "A suspect may waive his rights when," for example, "he received and understood the *Miranda* warnings, did not invoke his *Miranda* rights, and implicitly waived the rights by making an uncoerced statement to the police." *Burney*, 175 F.4th at 1114 (citation modified).

Even if a suspect initially waives his right to counsel after receiving *Miranda* warnings, if the suspect later "requests an attorney during a custodial interrogation, 'he is not subject to further questioning until a lawyer has been made available.'" *Tobias v. Arteaga*, 996 F.3d 571, 580 (9th Cir. 2021) (quoting *Davis*, 512 U.S. at 458). To invoke his right to counsel during interrogation, "the suspect must unambiguously request counsel." *Davis*, 512 U.S. at 459. Once an unambiguous request for counsel is made, "responses to further questioning cannot be used to

PAGE 14 – OPINION AND ORDER

cast doubt upon the adequacy of his initial request." *Smith*, 860 F.2d at 1529. "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," then officers do not have to stop their questioning. *Davis*, 512 U.S. at 459 (emphasis in original).

In this case, Williams's purported invocations of his right to counsel require careful parsing because each involves different considerations. First, as a preliminary matter, Williams both expressly and implicitly waived his rights after he received *Miranda* warnings. Although Williams argues that his *Miranda* waiver was invalid due to Agent Pasquale's interruption of an alleged invocation, Williams expressly waived his rights when he signed the written *Miranda* waiver form. Even assuming Williams's express waiver was somehow defective, Williams implicitly waived his *Miranda* rights by answering agents' initial questions after he signed the waiver form. Second, Williams's later invocation of his right to counsel, "I would prefer to do that with my attorney," was an unequivocal invocation of his right to counsel with respect to his bank accounts. Williams Tr. 77:22–23, ECF 162-1 at 77. Therefore, any subsequent statements that Williams made in response to questions concerning his bank accounts must be suppressed. Third, Williams repeatedly made blanket invocations of his right to counsel near the end of the interrogation. Any statements that Williams made after the first of these invocations must also be suppressed. Williams Tr. 168:25, ECF 162-1 at 168; Williams Video 2:51:40–44, ECF 163.

### 1. Initial Waiver of *Miranda* Rights

The government has met its "heavy burden" of demonstrating that Williams waived his *Miranda* rights at the start of the interrogation. *Rodriguez v. McDonald*, 872 F.3d 908, 922 (9th Cir. 2017). After Mirandizing Williams, Agent Smith asked, "So you don't have any issue talking to us; right?" Williams Tr. 4:5–6, ECF 162-1 at 4. Williams responded, "No, I don't have

PAGE 15 – OPINION AND ORDER

an issue, but I would like to --," but before he completed his sentence, Agent Pasquale started speaking. Williams Tr. 4:7–8. Williams argues that the interruption prevented him from invoking his right to counsel. Reply, ECF 172 at 9–10. According to Williams, "[t]here is no innocent completion of that sentence fragment that does not involve a request for counsel." *Id.* But Williams's post hoc speculation cannot negate his subsequent signing of a written *Miranda* waiver form. Waiver, Ex. 3, ECF 162-2. Williams does not contend that either the verbal or written warnings failed to "reasonably convey to [him] his rights as required by *Miranda*." *Doody v. Ryan*, 649 F.3d 986, 1002 (9th Cir. 2011) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)). Nor could he because they fully apprise him of his rights. Therefore, the interruption does not negate the validity of Williams's signed waiver form.

In any event, "an express verbal or written waiver is not required," and here Williams also implicitly waived his rights. *Burney*, 175 F.4th at 1114. Williams does not dispute that "he received and understood the *Miranda* warnings." *Id.* (citation modified). Although he disputes whether Agent Pasquale prevented him from invoking his right to counsel by interrupting him, it is clear that the words he actually spoke, "No, I don't have an issue, but I would like to --," do not constitute an unequivocal invocation of his right to counsel. Williams Tr. 4:7–8. And because Williams did not invoke his *Miranda* rights after receiving and understanding verbal and written *Miranda* warnings, he "implicitly waived [his] rights by making . . . uncoerced statement[s] to the [agents]" following these warnings. *Burney*, 175 F.4th at 1114 (citation modified).

Williams quotes *Smith v. Endell*, 860 F.2d 1528, 1530 (9th Cir. 1988), for the proposition that law enforcement officers cannot "prevent a suspect from making an unambiguous request for counsel by cutting him off." Reply, ECF 172 at 9. But neither this quote nor the underlying proposition appears in *Smith*. Rather, *Smith* concerned the application of two black-letter legal

PAGE 16 – OPINION AND ORDER

principles relating to the validity of a defendant's invocation of his *Miranda* rights: (1) "A suspect's responses to further questioning cannot be used to cast doubt upon the adequacy of his initial request;" and (2) "When the initial request is ambiguous or equivocal, all questioning must cease, except inquiry strictly limited to clarifying the request."[4] *Smith*, 860 F.2d at 1529.

As to (1), the Ninth Circuit found that the defendant "Smith's initial request for counsel was not equivocal or ambiguous." *Id.* at 1531. Indeed, Smith unequivocally and unambiguously requested a lawyer when he asked: "Can I talk to a lawyer?" *Id.* at 1529, 1531. Smith did follow up this question with the following statements: "At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" *Id.* at 1529. But as the Ninth Circuit explained, although this request was a "conditional" one, "the investigators knew the condition to be satisfied," and thus, "questioning should have stopped until an attorney was present[.]" *Id.* at 1531–32. In light of this valid invocation, the Ninth Circuit faulted the trial court for relying on subsequent statements made by Smith to cast doubt on the invocation. *Id.* at 1532 n.3. As to (2), the Ninth Circuit found that even if Smith's request "were regarded as in some way ambiguous or equivocal," the officers ran afoul of the rule that "an equivocal request for counsel permits the police only to ask the suspect questions that seek to clarify" his request. *Id.* at 1532–33. Instead of clarifying, the officers "repeated recitations of the circumstances tying Smith to the murders [that] did nothing to clarify Smith's desire for counsel." *Id.* at 1533.

---

[4] In *United States v. Rodriguez*, 518 F.3d 1072 (9th Cir. 2008), the Ninth Circuit recognized that the Supreme Court's decision in *Davis v. United States*, 512 U.S. 457 (1994), "abrogated our clarification rule only to the extent that our rule required clarification of invocations made *post-waiver*." *Rodriguez*, 518 F.3d at 1080. However, to the extent this rule "requires pre-waiver clarification of a suspect's wishes concerning his *Miranda* rights, it has not been superseded by *Davis*." *Id.* Thus, "[p]rior to obtaining an unambiguous and unequivocal waiver, a duty rests with the interrogating officer to clarify any ambiguity before beginning general interrogation." *Id.*

Unlike in *Smith*, here Williams cannot claim that he made *any* request for his attorney after being read his *Miranda* rights, let alone a request that was unequivocal and unambiguous. In fact, before the interruption, Williams stated that he did *not* have an issue with talking to the agents. After Agent Smith asked, "So you don't have any issue with talking to us; right?" Williams Tr. 4:5–6, ECF 162-1 at 4, Williams responded, "No, I don't have an issue." *Id.* 4:7–8. Although Williams proceeded to say, "but I would like to," before being interrupted, *id.* 4:8, he never mentioned anything about contacting an attorney. As the Supreme Court has made clear, "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). Williams did not even mention an "attorney" or "counsel" in his cutoff sentence, and he relies on speculation to claim that he was attempting to invoke his right to counsel. Speculation cannot transform his statement into one that a reasonable officer would interpret as "an expression of a desire for the assistance of an attorney." *McNeil*, 501 U.S. at 178.

And because Williams did not provide an equivocal or ambiguous invocation of his right to counsel after he was Mirandized, federal agents did not have "a duty . . . to clarify any ambiguity before beginning general interrogation." *Rodriguez*, 518 F.3d at 1080. While "an equivocal request for counsel permits the police only to ask the suspect questions that seek to clarify," *Smith*, 860 F.2d at 1533, here Williams made no request at all, whether equivocal or unequivocal. Perhaps recognizing that *Smith* does not support his argument, Williams resorts to providing a non-existent quotation from the case: "The Ninth Circuit held that officers cannot 'prevent a suspect from making an unambiguous request for counsel by cutting him off.'" Reply,

PAGE 18 – OPINION AND ORDER

ECF 172 at 9. This Court admonishes Williams's counsel for misquoting *Smith*,[5] but at the same time, this Court does not endorse Agent Pasquale's interruption of Williams. But, having reviewed the video of the interview, this Court does not find that Agent Pasquale intentionally prevented the invocation of counsel by talking over Williams. Agent Pasquale's tone of voice and manner were conversational, cordial and low-key, and not demanding or coercive. Williams Video 1:44–54, ECF 163. The record shows that a reasonable officer in Agent Pasquale's position would conclude that Williams was voluntarily waiving his right to counsel when Williams was read his Miranda rights and said "[n]o, I don't have an issue [talking to you]." Williams Tr. 4:7-8. This Court finds that Williams then voluntarily expressly waived his *Miranda* rights by signing a written waiver form and implicitly waived his rights considering "the totality of the circumstances," as previously discussed. *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005). The fact that he was interrupted mid-sentence, having never said anything about wanting to speak to counsel, was neither an equivocal nor unequivocal invocation of his right to counsel and does not undermine his knowing and voluntary waiver of his right to counsel.[6]

---

[5] At the hearing, Williams's counsel stated that this error was not a result of using generative AI but rather an inadvertent mistake. This Court reminds Williams's counsel that he is responsible for not only his own contributions but also his client's contributions to any of his submissions.

[6] Williams also points to his subsequent statement, "because I forget who it was earlier, but I was asking, when do I get to —," as an invocation of his right to counsel. Motion, ECF 153 at 8. However, Williams omits that the full quote is: "because I forget who it was earlier, but I was asking, when do I get to -- *I have no problem with talking to you about any of this*." Williams Tr. 76:4–6, ECF 162-1 at 76 (emphasis added). Williams explicitly expressed his willingness to speak with agents, and thus his self-interruption was not an unequivocal request for counsel.

PAGE 19 – OPINION AND ORDER

### 2. Selective Invocation of Right to Counsel

Williams initially waived his *Miranda* rights, but he later made a selective invocation of his right to counsel with respect to his bank accounts. "[J]ust as a suspect in custody may refuse to answer all questions, he may selectively exercise his *Miranda* rights to silence and to counsel." *Michaels*, 51 F.4th at 921. Therefore, "when a suspect selectively invokes his right to silence or to counsel, *Miranda* requires interrogation to end with respect to the subject matter . . . as to which the suspect invoked the right." *Id.* at 922 (citing *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975); *Miranda*, 384 U.S. at 473–74). To make a selective invocation, as with a blanket invocation, "a suspect must invoke any *Miranda* right unambiguously and unequivocally." *Id.*

On page 77 of the interview transcript, Williams unambiguously and unequivocally invoked his right to counsel with respect to questions concerning his bank accounts. Williams made a selective invocation at the end of the following exchange between Bertnik and Pasquale:

> **BERTNIK**: All I want to do is go through and talk about your EIDLs and say, "Hey, did this one go into this account?" Boom. "Did this one go into this account?" We kind of already talked about it, but I'm just looking at the actual --
>
> **PASQUALE**: And if you don't want to go into the bank accounts, you're, like "I don't want to answer those questions," then you don't have to answer the questions.
>
> **BERTNIK**: Yeah. We can move on.
>
> **PASQUALE**: You're perfectly in your right to say that.
>
> **WILLIAMS**: *I would prefer to do that with my attorney.*
>
> **PASQUALE**: Can we talk about Eric and Bayless? Can we move on to that piece?

Williams Tr. 77:9–25, ECF 162-1 at 77 (emphasis added). Even the government concedes that this "exchange shows a subject-specific limitation." Response, ECF 162 at 13. Indeed, the Ninth Circuit has held that a similar, but arguably even more equivocal statement, "I should talk to a lawyer," qualified as an unequivocal request for counsel. *Smith*, 860 F.2d at 1531; *see id.* ("[H]is statement was not equivocal; there was no 'might' or 'maybe' or 'perhaps.'"). Therefore, the

PAGE 20 – OPINION AND ORDER

dispute here centers on the scope of "that" in Williams's invocation. Whereas the government argues that Williams "drew a line around questions concerning whether EIDL funds went into particular bank accounts," Response, ECF 162 at 13, Williams argues that he "invoked counsel with respect to financial topics, specifically bank accounts and fund movement," Reply, ECF 172 at 11. When considering Williams's statement in context, this Court finds that the scope of his selective invocation is broader than the government's view and narrower than Williams's view. Specifically, Williams invoked his right to counsel with respect to questions pertaining to his bank accounts, not just EIDL deposits into his accounts, and he did not invoke as to all financial topics.[7]

The Ninth Circuit's analysis of a selective *Miranda* waiver in *Michaels v. Davis*, 51 F.4th 904 (9th Cir. 2022), is instructive. In *Michaels*, the defendant Kurt Michaels was arrested for murder and subject to custodial interrogation. *Id.* at 915. During the interrogation, the following exchange occurred after the detectives Mirandized Michaels and he initially agreed to speak with them. *Id.* at 919.

> **DETECTIVE**: Well, what's your side of the story? What happened?
>
> **MICHAELS**: *I don't know if I should without an attorney.* (Laughter.) It ain't going to do me no . . . . (Laughter.)
>
> **DETECTIVE**: Well, we need to know. Let's put it this way, Kurt. He just advised you of your rights. And you said, that yeah, you wanted to talk to us. There's no problem. If at any time that you do not want to talk with us, you can stop at any particular time. If there's any time that we ask you a question that you don't want to answer, you can stop at any time.
>
> **MICHAELS**: *Okay, that one.* (Laughter.)

---

[7] At the hearing, the government appeared to agree with this Court's determination regarding the scope of Williams's selective invocation of his right to counsel as encompassing his bank accounts.

PAGE 21 – OPINION AND ORDER

*Id.* at 919–20 (emphasis in original). With respect to Michaels's first statement, "I don't know if I should without an attorney," the Ninth Circuit found that it was ambiguous. *Michaels*, 51 F.4th at 923. However, with respect to Michaels's second statement, "Okay, that one," the Ninth Circuit reasoned that "[i]n context, the phrase 'Okay, that one' is susceptible to only one reasonable interpretation." *Id.* at 925. And that one reasonable interpretation was that Michaels made "an unambiguous invocation of the right that he was just informed of—to 'stop [talking] at any particular time'—with respect to the last question he was asked: 'Well, what's your side of the story? What happened?'" *Id.* (brackets in original). The Ninth Circuit even relied on the dictionary definition of "that"," which "refers to '*a* fact, act, or occurrence, or *a* statement or question, implied or contained in the previous sentence.'" *Id.* at 923 (emphasis in original) (quoting *That*, Oxford English Dictionary (2d ed. 1989)). Thus, "the interrogating officers should have ceased asking him about 'What's your side of the story? What happened?'" *Id.* at 925. Instead, the officers "proceeded along precisely the same line of questioning," and consequently, the Ninth Circuit concluded that "the detectives' continued questioning regarding Michaels's role in the murder after Michaels's selective invocation did violate his *Miranda* rights." *Id.*

Applying the Ninth Circuit's reasoning in *Michaels* to Williams's statement, "I would prefer to do that with my attorney," the scope of Williams's selective invocation is apparent. When Williams stated he would "prefer to do *that*" with his attorney, he made "an unambiguous invocation of the right that he was just informed of," *id.* at 925—to not "have to answer the questions" that relate to "the bank accounts." Williams Tr. 77:16–18, ECF 162-1 at 77. As the Ninth Circuit explained in detail, "that" refers to a "*statement* or question[] implied or contained in the previous sentence." *Michaels*, 51 F.4th at 923 (emphasis added) (quoting *That*, Oxford English Dictionary (2d ed. 1989)). Here, the last statement pertaining to any subject matter

PAGE 22 – OPINION AND ORDER

before Williams invoked his right to counsel with respect to that subject matter was Agent Pasquale's statement, "And if you don't want to go into the *bank accounts*, . . . then you don't have to answer the questions." Williams Tr. 77:15–18, ECF 162-1 at 77 (emphasis added). Although arguably Agent Pasquale's reference to "*the* bank accounts" suggests that the agent was referencing the prior statement by Agent Bertnik about funds from the EIDLs, this Court must determine the scope of the waiver that Williams intended. Because there is some ambiguity here with regard to which of his bank accounts Williams did not want to discuss without counsel, this Court construes his selective waiver to cover all of Williams's bank accounts. Therefore, the federal agents' subsequent questioning regarding Williams's bank accounts violated his *Miranda* rights. *Michaels*, 51 F.4th at 925. Williams did later "answer questions regarding the subject he had declared off-limits, . . . [b]ut an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Id.* (citation modified). As a result, this Court suppresses all statements that Williams made in response to questions concerning his bank accounts after page 77 of the transcript.[8]

### 3. Blanket Invocation of Right to Counsel

Although the invocations on pages 77 and 148 of the transcript were only selective invocations, beginning on page 168 of the transcript, Williams made several unequivocal and unambiguous requests for counsel.[9] *See* Motion, ECF 153 at 9 (numbering these invocations as

---

[8] In his reply brief, Williams points to a second selective invocation he made later in the interrogation with respect to what money he used to purchase three cars. Reply, ECF 172 at 12. Agent Pasquale asked, "Well, did you use the PPP money specifically to buy those three cars? Are you sure of that?" Williams replied, "No. That I will leave for when the attorney comes in." Williams Tr. 148:17–21, ECF 162-1 at 148. The government honored this selective invocation and did not ask Williams again about the cars. As a result, there are no statements to suppress.

[9] Although Williams provides no argument based on his asserted invocation of his right to counsel on page 130 of the transcript, Williams's question falls squarely into the category of an ambiguous request for counsel: "Do you know if at some point I get to call my attorney, or is that

PAGE 23 – OPINION AND ORDER

invocations 8–12). Once again, "[i]f a suspect 'indicates in any manner and at any stage of the process that he wishes to consult with an attorney,' all questioning must cease." *Sessoms*, 776 F.3d at 622 (quoting *Miranda*, 384 U.S. at 444–45). On page 168 of the transcript, Williams unequivocally and unambiguously invoked his right to counsel when he asked, "Can I call my attorney?" Williams Tr. 168:25, ECF 162-1 at 168. The Ninth Circuit has specifically determined that these words verbatim constitute a defendant "clearly invok[ing] the right to counsel." *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992). And the government does not dispute that Williams's request—along with his subsequent identical and similar requests to call his attorney—are clear invocations of his right to counsel. Therefore, "[q]uestioning should have ceased after the first request for counsel, which the officers ignored[.]" *Sessoms*, 776 F.3d at 623. Because agents did not cease questioning, all statements after page 168 must be suppressed.[10]

---

something later?" Williams Tr. 130:10–11, ECF 162-1 at 130; *see Tobias*, 996 F.3d at 580–81 (collecting Ninth Circuit cases that have held the following statements to be "ambiguous" requests for counsel: "I think I would like to talk to a lawyer," "Maybe [I] ought to see an attorney," and "I might want to talk to a lawyer" (citation modified)). Because this ambiguous invocation occurred after his initial *Miranda* waiver, federal agents did not have any duty to clarify whether Williams was requesting counsel. *See supra* n.4; *Rodriguez*, 518 F.3d at 1080.

[10] Williams argues in passing that in addition to suppressing any statements that agents obtained in violation of his *Miranda* rights, this Court should "[s]uppress all derivative evidence obtained as a result of the statements." Motion, ECF 153 at 24. However, Williams misapprehends the scope of the remedy for a *Miranda* violation. In the Ninth Circuit's words, "[t]he Supreme Court determined in *United States v. Patane*, 542 U.S. 630 (2004) that the physical evidence obtained as a result of a custodial interrogation without *Miranda* warnings is nevertheless admissible." *United States v. Mora-Alcaraz*, 86 F.3d 1151, 1157 (9th Cir. 2021). Therefore, Williams is mistaken that the government must show that any derivative evidence is admissible under the independent source doctrine or the inevitable discovery doctrine. *See Nix v. Williams*, 467 U.S. 431, 443–44 (1984); Reply, ECF 172 at 17. Although the government represents that the text messages and spreadsheets taken from Williams's phone "are available to the government from independent sources," Response, ECF 162 at 18, such physical evidence is also admissible regardless of whether the government proves that the independent source doctrine applies.

### C.  Remaining Issues

Williams makes three additional arguments for why all of his statements during the custodial interrogation must be suppressed, but none of the three arguments have merit.

#### 1.  *Missouri v. Seibert*

Williams argues that because federal agents questioned him in the car before he arrived at the IRS facility, where he received *Miranda* warnings, his statements at the IRS facility were obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). Under *Seibert*, "a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warnings—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights." *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006). To "determin[e] whether the interrogator deliberately withheld the *Miranda* warning[s], courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warnings." *Id.* at 1158. "Such objective evidence would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Id.* at 1159. If the court finds that "an interrogator has deliberately employed the two-step strategy, *Seibert* requires the court then to evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible." *Id.* at 1160.

Here, there is a lack of both objective and subjective evidence to "support an inference" that any interrogation occurred in the car, let alone that a "two-step interrogation procedure was used to undermine the *Miranda* warning[s]" given at the IRS facility. *Id.* at 1158. Williams points to two statements by Agent Pasquale during the recorded interrogation as the basis for arguing that an earlier interrogation occurred during the car ride to the IRS facility. *See* Motion,

PAGE 25 – OPINION AND ORDER

ECF 153 at 18–19. The first statement occurs on page 4 of the transcript when Agent Pasquale says: "At the end of the day, like, what we were trying to talk about in the car and help you understand is that there are many layers above you and this is that opportunity that we have." Williams Tr. 4:9–12, ECF 162-1 at 4. The second statement occurs on page 11: "He [Agent Smith] gets very into the weeds with the tax stuff. Like I told you in the car, he loves numbers. He's a numbers guy." *Id.* 16:8–10, ECF 162-1 at 16.

These statements fall short of showing that federal agents "deliberately withheld . . . *Miranda* warning[s]" while interrogating Williams during the car ride. *Williams*, 435 F.3d at 1158. This Court agrees with the government that these two statements "reflect[] some prewarning conversation during transport," but they "do[] not show a prewarning confession, substantial overlap between an unwarned confession and a later warned repetition, or any deliberate two-step strategy." Response, ECF 162 at 12. The first statement suggests that agents spoke to Williams about other coconspirators "above" Williams in the PPP fraud scheme, and the second statement indicates that Agent Pasquale told Williams about Agent Smith's tax expertise. The lack of "completeness of the prewarning interrogation" and the lack of "overlapping content of pre- and postwarning statements" establish that no deliberate two-step interrogation occurred as to warrant suppression of Williams's entire recorded interrogation. *Williams*, 435 F.3d at 1159. Although there was "continuity of police personnel" and both the "timing" and "setting" of the car ride conversation were in close proximity to the recorded interrogation, *see id.*, these factors do not outweigh the dearth of any evidence to support the inference that agents deployed two-step interrogation tactics against Williams during the car ride. Moreover, the only evidence this Court does have is the sworn declaration of Agent Pasquale, which asserts that no such interrogation occurred in the car ride. Pasquale Declaration, ECF 190-

PAGE 26 – OPINION AND ORDER

1. Because this Court finds that no deliberate two-step interrogation occurred, suppression is unwarranted under *Seibert*.

### 2. *Corley v. United States*

Williams relies on *Corley v. United States*, 556 U.S. 303 (2009), to argue that his statements must be suppressed because of the unreasonable delay in his presentment before a magistrate judge, but Williams ignores the central holding of *Corley*, which created a safe harbor for confessions made within six hours of arrest. *Corley* held that "a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a *longer* delay was 'reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]')." 556 U.S. at 322 (emphasis added) (brackets in original) (quoting 18 U.S.C. § 3501(c)). "If the confession came within that [six-hour] period, it is admissible, subject to the other Rules of Evidence, so long as it was 'made voluntarily and . . . the weight to be given [it] is left to the jury.'" *Id.* (brackets and ellipses in original) (quoting 18 U.S.C. § 3501(c)). According to Williams, he was arrested "at approximately 9:30 AM," and "[t]he recorded interview began at approximately 10:46 AM and concluded at approximately 2:03 PM." Motion, ECF 153 at 6–7. That means the entire recorded interrogation at the IRS facility falls within *Corley*'s six-hour safe harbor. *See* Response, ECF 162 at 18; *see* Motion, ECF 153 at 6–7 (pointing out the timeline). Therefore, the delay in presentment to a magistrate judge provides no basis, independent from the *Miranda* violations discussed above, to suppress statements that Williams voluntarily made during the interrogation.

### 3. No Suppression Based on Presence of Prosecutor

Williams next argues that the "secret presence" of an Assistant U.S. Attorney during the interrogation via speakerphone "strengthens the case for full suppression rather than partial suppression." Motion, ECF 153 at 22–23. During the interrogation, the lead federal prosecutor

PAGE 27 – OPINION AND ORDER

on Williams's case listened to the interrogation over speakerphone, but Williams was not aware of her presence. *Id.* at 7. Williams contends that the prosecutor's "failure to halt the interview despite witnessing constitutional violations demonstrate[s] that the entire interview was infected by prosecutorial complicity." *Id.* at 23. Williams provides no legal authority to support the suppression of statements based on a federal prosecutor's presence, whether known or unknown to the defendant. In a different case, a federal prosecutor's words or actions could bear on the voluntariness of a defendant's *Miranda* waiver. But in this case, Williams makes no such argument that the federal prosecutor affected the voluntariness of his *Miranda* waiver. Nor could he because the federal prosecutor only listened—and did not question—Williams during the interrogation. On these facts, the federal prosecutor's presence via speakerphone does not affect the above analysis on the alleged *Miranda* violations during the interrogation.

## D.  Evidentiary Hearing

Finally, Williams requests an evidentiary hearing to address five alleged material factual disputes: (1) "the pre-Miranda car conversation," (2) "AUSA Bateman's presence and departure," (3) "the agents' motive for concealing AUSA Bateman's identity," (4) "whether agents were aware of the sealed indictment," and (5) "the completeness of the transcript." Motion, ECF 153 at 23–24. An evidentiary hearing is only warranted "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000); *see Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."). In his briefing and at the July 15, 2026, hearing, Williams has failed to allege contested issues of facts material to the suppression of his statements "with

PAGE 28 – OPINION AND ORDER

sufficient definiteness, clarity, and specificity" to warrant an evidentiary hearing. *Howell*, 231 F.3d at 620.

As to (2) and (3), the Assistant U.S. Attorney's "secret" presence via speakerphone is irrelevant to whether any statements must be suppressed. Consequently, there is no reason to hold an evidentiary hearing to uncover additional details about her presence. Similarly, as to (4), "whether agents were aware of the sealed indictment" is also irrelevant. Motion, ECF 153 at 23.

As to (1) and (5), in his briefing, Williams only points to Agent Pasquale's two statements, which suggest some conversation occurred during the car ride, as the basis for supplementing the record. As discussed above, these statements alone fall far short of suggesting that agents deliberately interrogated Williams in the car absent *Miranda* warnings. And Agent Pasquale's sworn declaration demonstrates the lack of any contested issue regarding whether any deliberate interrogation occurred during the car ride. Agent Pasquale states that while present in the car during Williams's transport, neither he nor any other federal officer "ask[ed] [Williams] substantive investigative questions about the charged conduct, including questions about PPP applications, EIDL applications, PPP forgiveness applications, loan proceeds, supporting documents, employee counts, payroll, gross revenues, cost of goods sold, bank accounts, any co-conspirator, or defendant's involvement in the alleged offense conduct." Declaration, ECF 190-1 ¶¶ 10–11. Moreover, Pasquale states that during the transport, Williams "did not confess to the charged conduct, "did not admit involvement in the charged conduct," and "did not make any spontaneous incriminating admissions regarding the charged conduct." *Id.* ¶¶ 12–14. In short, "no agent present during the transport deliberately used the transport as an opportunity to obtain unwarned admissions or a confession, nor were admissions or a confession obtained from defendant before a later Mirandized interview" that occurred at the IRS facility. *Id.* ¶ 9.

PAGE 29 – OPINION AND ORDER

However, at the outset of the July 15, 2026 hearing, for the first time in this case, Williams's attorney represented that Williams invoked his right to counsel during the car ride. Nowhere in the record had Williams made this factual assertion, so to supplement the record, this Court offered Williams the opportunity to provide testimony at the hearing to support this assertion. Williams initially expressed a desire to testify, but he also requested the ability to cross-examine Pasquale about matters beyond the car ride, specifically the recorded interview. This Court declined to expand the scope of any testimony because no contested issue of fact exists regarding the recorded interview; the transcript and video recording speak for themselves. Williams subsequently withdrew his request to testify at the evidentiary hearing. Therefore, Williams fails to "allege facts with sufficient definiteness, clarity, and specificity to enable" this Court to find any contested issue of fact exists concerning the lack of any interrogation during the car ride from Williams's arrest to the IRS facility. *Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

### CONCLUSION

For the above reasons, this Court GRANTS IN PART and DENIES IN PART Williams's Motion to Suppress, ECF 153. Any statements that Williams made after page 77 of the interview transcript, ECF 162-1, in response to questions concerning his bank accounts are suppressed. In addition, all statements that Williams made after page 168 of the transcript are suppressed. This Court ORDERS the government to provide Williams with a redacted transcript of his March 21, 2023 interview, reflecting the suppression of statements consistent with this Opinion and Order.

**IT IS SO ORDERED.**

DATED this 31st day of July, 2026.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 30 – OPINION AND ORDER